318 S.E.2d 428

**MID–EASTERN GEOTECH, INC.**

v.

**Gretchen O. LEWIS, Commr and The West Virginia Workers' Compensation Fund.**

No. 16113.

Supreme Court of Appeals of West Virginia.

June 13, 1984.

Jenkins, Fenstermaker, Krieger, Kayes & Farrell, Huntington, for appellant.

C. Terry Owen, Legal Division, Workers' Compensation Commission, Charleston, for appellee.

McHUGH, Chief Justice:

This original proceeding in mandamus and in the alternative in prohibition, is before this court upon the petition of Mid-Eastern Geotech, Inc. The petitioner (hereinafter "Geotech") seeks to be reinstated as a subscriber in "good standing" to the West Virginia Workers' Compensation Fund. The respondents are Gretchen O. Lewis (the West Virginia Workers' Compensation Commissioner) and the West Virginia Workers' Compensation Fund.[1] This Court has before it the petition, all matters of record and the briefs and argument of counsel.

Geotech became a subscribing employer to the West Virginia Workers' Compensation Fund on January 1, 1980. As a subscriber, Geotech was required, under *W.Va.Code*, 23-2-5 [1974], to pay quarterly premiums and make quarterly payroll reports to the workers' compensation commissioner.[2] Employer coverage under the workers' compensation laws of West Virginia results in certain exemptions of the employer from liability for the injury or death of the employer's employees. *W.Va. Code*, 23-2-6 [1974]. *See also W.Va.Code*, 23-4-2 [1983].

In December, 1983, the respondents determined that the account of Geotech with the workers' compensation fund was in default. That determination was based upon the conclusion of the respondents that Geotech failed to properly submit various quarterly payments and reports to the fund. The respondents contend that in order for Geotech to be reinstated as a subscriber in good standing,[3] Geotech must pay to the workers' compensation fund (1) the deficiency in Geotech's account balance, (2) all interest due upon untimely premium payments[4] and (3) an amount in reimbursement to the workers' compensation fund for benefits paid from the fund relating to Geotech's account, such benefits from the fund having been paid while Geotech's account was allegedly in default.[5]

However, Geotech asserts that during the period in question it made all required payments to the workers compensation fund[6] and believed that its account was in

---

1. The phrase "workers' compensation" is now used in this State in place of the phrase "workmen's compensation." *See W.Va.Code*, 23-1-1 [1983].

2. *W.Va.Code*, 23-2-5 [1974], provides, in part, as follows:

    For the purpose of creating a workmen's compensation fund each employer subject to this chapter shall pay the premiums of liabilities based upon and being such a percentage of the payroll of such employer as may have been determined by the commissioner and be then in effect. The premiums shall be paid quarterly.... Each employer shall make a payroll report to the commissioner for each quarter as heretofore specified, and such report shall be on the form or forms prescribed by the commissioner, and furnish all information required by him.

3. *W.Va.Code*, 23-2-5 [1974], provides, in part, as follows:

    An employer required by this chapter to subscribe and pay premiums to the workmen's compensation fund, and to make the quarterly payroll reports required by the commissioner as herein provided, and who defaults or fails to comply with any of said requirements shall be restored to the benefits and protection of this chapter only upon the

payment into the workmen's compensation fund of all unpaid premiums, penalties, and charges, provided herein, and the making of all delinquent quarterly payroll and other reports required by the commissioner.

4. The charging of interest upon past due payments is provided by *W.Va.Code*, 23-2-13 [1982].

5. *W.Va.Code*, 23-2-5 [1974], provides, in part, as follows:

    [A]ny employer required by this chapter to subscribe and pay premiums to the workmen's compensation fund as herein provided and who fails to do so shall be liable to the workmen's compensation fund for all benefits paid from the fund to his employees, as well as for all premiums otherwise due and owing to said fund as herein provided....

6. The record in this proceeding indicates as follows with respect to the Geotech account with the workers' compensation fund:

    (1) *quarter ending March 31, 1980*—Since the institution of the proceeding before this Court, the parties have indicated that Geotech did not default with respect to the quarter ending on March 31, 1980. There is evidence in the

good standing. Furthermore, Geotech asserts that at no time prior to December, 1983, did the respondents notify Geotech of any default in the Geotech account.[7] Geo-

record, however, that Geotech may have failed to timely make its premium payment for that quarter and that the respondents, therefore, considered a default to have occurred. *See* memoranda of Jerry Bartlett, Audit Clerk, Workers' Compensation Fund.

(2) *quarters ending June 30, 1980; September 30, 1980; December 31, 1980; and March 31, 1981* —The record indicates that no particular problems existed concerning these quarters.

(3) *quarter ending June 30, 1981* —The respondents assert that although Geotech paid the appropriate premium for the quarter ending on June 30, 1981, that premium, as well as Geotech's quarterly report, were not timely filed. Geotech asserts that it received no notice of any interest assessment because of the late premium payment. Nor did Geotech receive any other notice indicating that a default had occurred.

(4) *quarter ending September 30, 1981* —The respondents assert that although Geotech acted in a timely manner concerning the quarter ending on September 30, 1981, a deficiency was found in the Geotech account. Geotech was notified of the deficiency by letter. That letter stated that Geotech was required to pay $1,377.11 to the workers' compensation fund in order for the Geotech "account to remain in good standing." Geotech asserts that it paid the $1,377.11 and believed that its account was in good standing.

(5) *quarter ending December 31, 1981* —The respondents assert as follows: "The report for the quarter ending December 31, 1981, was received in a timely manner and the payment was such to restore the account's deposit balance to its appropriate level."

(6) *quarter ending March 31, 1982* —The respondents assert as follows: "The report for the quarter ending March 31, 1982, was received with no payment. The firm apparently miscalculated the premium believing they had enough on deposit to cover their premium for the quarter. Therefore, their deposit for the quarter ending March 31, 1982, was subsequently incorrect." Geotech essentially agrees with that assertion but further states that it received no notice of any default.

(7) *quarter ending June 30, 1982* —The respondent contends that Geotech's quarterly report for the quarter ending on June 30, 1982, was filed late and that the premium submitted by Geotech was insufficient to cover the deficiency in the Geotech account. That deficiency was a continuation of the deficiency from the quarter ending on March 31, 1982. Geotech, however, asserts that it was unaware of the account deficiency until the latter part of 1982.

(8) *quarter ending September 30, 1982* —The record indicates that although Geotech filed its quarterly report for the quarter ending on September 30, 1982, no premium was submitted. A cash payment was subsequently made by Geo-

tech. However, a deficiency continued to exist in the Geotech account.

(9) *quarter ending December 31, 1982* —The respondents assert as follows: "The report for the quarter ending December 31, 1982, was received. However, because of the deposit problems associated with the previous three (3) quarters, the amount remitted was not enough to restore the deposit balance to the proper level."

(10) *quarter ending March 31, 1983* —The respondents assert that although Geotech filed its quarterly report for the quarter ending on March 31, 1983, no premium was submitted. Geotech indicates, however, that it did not believe that any payments were then owed by it to the workers' compensation fund. Nevertheless, Jerry Bartlett, Audit Clerk, Workers' Compensation Fund, notified Geotech that an additional amount was due. Geotech paid that amount, and the respondents state as follows: "A cash payment of $211.84 was received and applied towards the firm's deposit. This amount was enough to restore their deposit balance for the quarter ending March 31, 1983, to the appropriate level."

(11) *quarters ending June 30, 1983, and September 30, 1983* —The respondents assert that Geotech filed quarterly reports for the quarters ending on June 30, 1983, and September 30, 1983, but did not submit premium payments. Geotech asserts that since December 6, 1983, it has attempted to pay those premiums but that such payments were rejected by the respondents.

7. According to the respondents, Geotech's default consisted primarily of filing with the workers' compensation fund late reports and late premium payments. Such late filings resulted in the assessment of interest against the Geotech account. There is no dispute in the record that Geotech, prior to December, 1983, received no notice of the unpaid interest and no notice that Geotech's account was in default for failure to pay that interest. The record indicates, however, that Geotech was notified during the period in question of certain deficiencies in its account. Geotech paid those deficiencies. *See* n. 6, *supra.*

Paragraph four of the respondents' answer states, in part, as follows:

While the Fund did notify Geotech of its default status because of an insufficient account balance, the petitioner was not notified whenever the account was in default because of late filing which resulted in unpaid interest due. The last type of default is not readily apparent to the respondent, because the Fund's computer only reveals defaults created through failure to file quarterly reports or failure to maintain a sufficient account balance. Current programming capability does

tech therefore asserts that the respondents should be directed to recognize Geotech as a subscriber in good standing to the West Virginia Workers' Compensation Fund.

The respondents contend that the default of Geotech consisted primarily of filing with the workers' compensation fund late quarterly reports and premium payments. Accordingly, pursuant to *W. Va. Code*, 23–2–13 [1982], interest was assessed against the Geotech account. That statute provides that "[p]ayments unpaid on the date on which due and payable ..." shall bear interest.

The record indicates that Geotech offered to pay to the workers' compensation fund the amount of accrued interest and any unpaid premiums. However, the record further indicates that, prior to December, 1983, Geotech received no notice of the interest assessment and no notice that Geotech's account was in default for failure to pay that interest assessment. *See* n. 7, *supra.* Geotech therefore contests its liability to the fund for benefits paid from the fund relating to Geotech's account, such benefits having been paid while Geotech's account was allegedly in default. Geotech contends that because it was never afforded notice of the interest assessment or default status, Geotech did not, during the period in question, lose the benefits and protections of the West Virginia workers' compensation laws.

In 1983, the West Virginia Legislature enacted *W. Va. Code*, 23–2–5b [1983]. That statute went into effect on May 24, 1983, and is thus relevant to the circumstances of this proceeding. Pursuant to the provisions of *W. Va. Code*, 23–2–5b [1983], an employer in default for failure to subscribe or pay premiums to the workers' compensation fund was accorded an opportunity to settle that default for an amount including "all delinquent premium payments, plus interest...." That statute provides, in part, as follows:

(a) On or before the first day of October, one thousand nine hundred eighty-three, any employer who may qualify under this section shall apply to the commissioner for a settlement of the amount of default....

(b) Notwithstanding other provisions of this chapter to the contrary, upon timely receipt of the application prescribed in subsection (a) of this section, the commissioner shall declare the employer to be reinstated to the benefits and protection of this chapter....

(c) After the commissioner shall have received the application of an employer as prescribed herein, the commissioner and the employer or its authorized agent shall agree, in writing, on or before the first day of July, one thousand nine hundred eighty-four, to settle the default in an amount which shall include all delinquent premium payments, plus interest, compounded monthly, at the rate that would have been earned on the premiums had they been timely paid. The commissioner may authorize payment of the amount set forth in the agreement on a payment schedule, which period shall not exceed three years from the date of the execution of the agreement. The agreement shall set forth that the employer shall be in default if any payment shall not be received by the commissioner within fifteen days of the due date thereof.

. . . .

(e) The commissioner shall notify in writing, within fifteen days of the effective date of this section, all employers who are in default as indicated by the records of the commissioner of the employer's right to apply for a settlement in accordance with the provisions of this section. The commissioner may also take additional steps, as deemed appropriate, to notify other employers of the rights set forth herein. The written notice of the commissioner shall include the form required for application and the commissioner shall make such form available to other employers.

In response to the enactment of *W. Va. Code*, 23–2–5b [1983], the respondents at-

---

not allow the Fund to monitor the timeliness of payments for each of the Fund's thirty-three thousand subscribers on a quarterly basis.

tempted to identify employers who were in default under the West Virginia workers' compensation laws. Relying upon computer information, 25,000 such employers were identified and provided with written notice of the provisions for account settlement under that statute. However, because of the nature of the problem relating to the Geotech account (the late filing of quarterly reports and premium payments) the respondents' computer did not identify Geotech as a defaulting employer.[8] Thus, Geotech did not receive written notice of the settlement provisions of *W. Va. Code*, 23-2-5b [1983]. It should be noted, however, that the respondents made announcements concerning *W. Va. Code*, 23-2-5b [1983], on radio and in newspapers.

The record indicates that not only did Geotech receive no notice of the settlement provisions of *W. Va. Code*, 23-2-5b [1983], it was not until December, 1983, after the deadline for settlement applications, that the respondents informed Geotech that its account was in default.

This Court does not condone the late filing by Geotech of its quarterly reports and premium payments with the Workers' Compensation Commissioner. The record indicates, however, that during the period in question, Geotech generally maintained its account with the workers' compensation fund at an "appropriate level," either by way of the payment of premiums or the payment of account deficiencies. The respondents notified Geotech of those account deficiencies, and Geotech paid them. *See* n. 6, *supra*. Geotech thus continued to make payments to the workers' compensation fund, even though its account was in default for failure to pay the interest assessment. Geotech, prior to December, 1983, received no notice of the unpaid interest assessment and no notice that Geotech's account with the fund was in default. *See* n. 7, *supra*. By then, the time for application for settlement under the provisions of *W. Va. Code*, 23-2-5b [1983], had passed.

We recognize the hardship faced by the Commissioner in timely identifying and notifying, under *W. Va. Code*, 23-2-5b [1983], the many employers in default with respect to the workers' compensation fund. The record indicates, however, that the radio and newspaper announcements of the settlement provisions of that statute occurred prior to the time, in December, 1983, that Geotech learned of its default status. We conclude, therefore, that Geotech should have been notified in writing of its right to apply, under *W. Va. Code*, 23-2-5b [1983], for a settlement of the amount of its default. In so concluding, we emphasize the fact, apparent from the record, that, based upon the capability of the respondents' computer system, defaulting employers who totally failed to make premium payments during the period in question were identified and provided with written notice of the provisions of *W. Va. Code*, 23-2-5b [1983], whereas Geotech, and presumably other employers, who made those payments, although untimely, received no such notice. *See* n. 7 and n. 8, *supra*.

Specifically, this Court holds that where an employer required to subscribe and pay premiums to the West Virginia Workers' Compensation Fund was determined by the West Virginia Workers' Compensation Commissioner to be in default for failure to pay interest assessed for past due quarterly premium payments, and that employer received no notice of the interest assessment, and, nevertheless, maintained its account with the workers' compensation fund at the level required by law by way of the payment of premiums and the payment of periodic account deficiencies, that employer was entitled to notice in writing of its right, under the provisions of *W. Va. Code*, 23-2-5b [1983], to apply to the Commissioner for a settlement of the amount of the employer's default. *See W. Va. Code*, 23-2-5b(e) [1983].

As indicated above, Geotech was improperly denied an opportunity during the period in question to apply, under *W. Va. Code*, 23-2-5b [1983], for a settlement of the

---

**8.** The respondents indicate that in the future they may have the capability, by computer, to monitor the timeliness of quarterly payments by employers such as Geotech.

amount of its default. Accordingly, the respondents are hereby directed to permit Geotech to apply for such a settlement under that statute. If an agreement of settlement is reached between the parties, Geotech must, of course, comply with all applicable provisions of law, such as *W. Va. Code*, 23–2–5b(d) [1983], which provides, as follows:

> If the employer shall fail to pay current premiums in accordance with the provisions of this chapter or if the employer shall default upon any payment set forth under the terms of the agreement, such agreement shall be null, void and of no effect and the commissioner shall have the authority to proceed in accordance with the provisions of this chapter.

Writ granted as moulded.